*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★  ★ ★ ★

# OPINION

No. 04-08-00754-CR

Richard **JETT**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-7499
Honorable Bert Richardson, Judge Presiding

Opinion by:   Steven C. Hilbig, Justice

Sitting:   Karen Angelini, Justice
Steven C. Hilbig, Justice
Marialyn Barnard, Justice

Delivered and Filed: May 12, 2010

AFFIRMED

Richard Jett was convicted of murder and sentenced to ninety-nine years in prison. Jett appeals the judgment, complaining the evidence is factually insufficient to support the jury's verdict and the trial court erred by conducting voir dire while he was absent from the courtroom, compelling his presence before the jury during trial, and admitting autopsy photographs of the victim. We affirm the judgment.

## FACTUAL BACKGROUND

On Wednesday, June 14, 2006, Arthur Daniels discovered the body of his father, Homer Daniels, at Homer's residence. Arthur called the police, and San Antonio Police Department Detective Jimmy Willingham was one of the officers who went to the crime scene.

Detective Willingham testified there was no sign of forced entry into the house. He saw the victim's body on the living room floor, and testified the body was in the early state of decomposition. Detective Willingham observed the victim had lacerations to his face, a stab wound to the left side of the neck, blunt force trauma on his forehead, and defensive wounds on his hands. He saw blood on the driveway, sidewalk, and front porch, blood around a light switch in the garage, cast-off blood on the ceiling in the room where the victim was found, and blood near the kitchen sink. Detective Willingham told the jury that it is common for an attacker who uses a knife to repeatedly stab a victim[1] to sustain injuries to his hands and fingers. Based on his experience, the detective believed the blood near the sink indicated the attacker washed his hands after the murder. Detective Willingham testified the blood around the light switch in the garage indicated that a person was "fumbling" for the light switch. He also believed the blood near the light switch and the sink belonged to the attacker because, given the nature of the victim's injuries, it was highly unlikely the victim would have been able to move from where the attack occurred.

Detective Willingham learned from Arthur that the victim's car was missing. While he was still at the murder scene, the detective received information the car had been found in a Wendy's parking lot. When Detective Willingham arrived at the parking lot, he saw the car was parked facing

---

[1] The medical examiner testified the victim suffered eight stab wounds to his head, seven of which would have been fatal. The victim also suffered three stab wound to the chest – all potentially fatal – and fifty-two other cuts to his body, thirty of which were to the head and neck.

an apartment complex. There was blood on the gear shift, steering wheel, and on the exterior of the car on the driver's side. Detective Willingham testified that, based on the position of the car in relation to the restaurant and the apartment complex, he believed the driver walked to the apartment complex. However, because it was dark, he was unable to discover any blood trail leading away from the vehicle. The detective later learned that appellant's sister lived in the complex.

The police developed information that led them to Alona Woods and appellant. Detective Willingham questioned Woods, who was described as Jett's wife. While doing so, he noticed she did not have any cuts to her hands. He also learned that appellant had called Woods from Daniels's house on the evening of June 12, 2006. Detective Willingham and San Antonio Police Department Detective Tim Angell interviewed Jett, who was in custody for an unrelated misdemeanor offense, on June 22. The detectives testified Jett had cuts to his hands, some of which they described as being deep. In a taped interview, which was played for the jury, Jett initially denied being at Daniels's house on the evening of June 12, 2006. However, he later admitted being there, and said he and Daniels were the victims of a "home invasion." Jett stated two masked men entered the house through an unlocked door, and one of them had a pistol. One of the men asked Daniels for money. When Daniels denied having any money, the man broke a beer bottle over Daniels's head. Jett said the other man got a knife from the kitchen and lunged at him with the knife. Jett claimed he deflected the attack by grabbing the knife blade, cutting his hands in the process. Jett told the detectives the men struck Daniels in the head with another beer bottle and then stabbed him. They then forced Jett to use Daniels's keys to unlock the garage door, but then ordered him to close and lock it again. Jett claimed he never entered the garage. According to Jett, the man with the knife threw it into a neighbor's yard and then the men forced him to drive to the north side of San Antonio.

He claimed he drove into a parking lot of a Wendy's restaurant on Fredericksburg at the attackers' directions. Jett said he jumped from the car and ran to his sister's apartment, which was next to the Wendy's. Jett had no explanation for why the attackers directed him to that particular parking lot. Jett told the detectives he did not call the police because he was afraid the authorities would think he committed the crime.

Detective Angell testified he did not entirely believe the story Jett told them in the interview. For example, Jett stated that, although he opened the garage door, neither he nor the alleged attackers went into the garage. However, blood the detective believed belonged to the attacker was found in the garage. Detective Angell also interviewed Jett's sister, Rosa Linda Medina, and learned Jett had told her an entirely different story about how he was injured.

Rosa Linda Medina testified Jett came to her apartment late in the evening of June 12, 2006. Her apartment complex was located next to the Wendy's on Fredericksburg Road. Medina told the jury that Jett's hands were dripping blood and he asked for her help. Jett told her that he had been walking down the street when he was attacked by "two black guys."

Roxanne Guerra testified she lived at the apartment complex next to the Wendy's. A friend dropped her off at the corner after Guerra got off work in the early morning hours of June 13, 2006. Guerra told the jury that while she was still in her friend's truck, she saw a Neon[2] drive into the lot and park. The people in the Neon stayed inside the car until Guerra walked past, on the way to her apartment. When Guerra heard the car doors open and close and the sound of footsteps, she turned around. Guerra testified she saw three or four people who had gotten out of the Neon walking

---

[2] Other testimony established this vehicle belonged to the victim.

behind her. She did not recognize them and thought the men appeared to be younger and Hispanic, although she was unsure of her description.

Alona Woods testified at trial that she lived with Jett in June 2006, and he had been her boyfriend for over five years. She testified she had known Daniels for about ten years, and that he had helped her over the years if she needed a ride or a place to stay. Woods testified that on June 12, 2006, she and Jett had been evicted from Jett's apartment. They drank heavily and had an argument. They parted and Woods later went to stay with a friend, Harold Gardner; Woods did not know what Jett planned to do. When Woods arrived at Gardner's house, she noticed that several calls had been made to Gardner's telephone from Daniels's house. Woods testified she returned the call and spoke to Homer Daniels. She said that while they were talking, she could hear Jett screaming in the background.

Woods testified she called Daniels the next day, on June 13, but nobody answered the telephone. She said she later went to Daniels's house, and when nobody answered the door, she walked around to the back door. She testified she found a steak knife in the grass near the air conditioner. She wrapped paper around the knife handle, picked it up, and threw it into the neighbor's yard. Woods told the jury that Jett had some mental health issues, and testified she thought perhaps Jett had hurt himself with the knife and Daniels had taken him to the hospital. She wanted to get rid of the knife so Jett could not injure himself with it. Woods testified she left the house without going inside. When she learned about the murder the following day, she called Daniels's son and told him about the knife.[3]

---

[3] The knife was subsequently recovered from the neighbor's yard and placed in evidence at trial. Dr. Jennifer Rulon, a Bexar County medical examiner, testified the knife was capable of inflicting the type wounds she observed on the victim.

Woods told the jury that after the body was discovered, Jett called her on the phone and told her that he had done something "really bad," but he did not tell her what it was. Woods also testified Jett later wrote her several letters asking her "to tell those people" Jett and Woods were together "at the time," presumably referring to the time of the murder. Woods testified she destroyed the letters.

Jett testified at trial, and told the jury that he met the victim through Woods. Jett said that after he was evicted, Daniels agreed to allow Jett to store his property at Daniels's house. Jett told the jury that Woods had been at Daniels's house until just before the attack.[4] Jett testified he had been drinking and that Woods spiked his beer. After Woods left, two men wearing ski masks rushed into the house through the unlocked front door and announced, "This is a robbery!" However, Jett told the jury he recognized the men by their voices as being his nephew, David Medina, and another man named Richard Holenman. He explained he had not told the detectives who the men were because he was protecting his nephew.

Jett testified that Holenman hit Daniels with a beer bottle when Daniels resisted. Then Medina retrieved a knife from a coffee table and attacked both Jett and Daniels with the knife. Jett said he deflected the attack by grabbing the blade. Medina then stabbed Daniels several times in the head. Jett testified that the men then directed him at gunpoint to the various places in the house and garage in an attempt to find money. Then they had Jett drive them in Daniel's car to the north side of San Antonio. Jett testified he knew Holenman was living at a motel on Fredericksburg Road. Although Holenman instructed him to pull into the parking lot of the motel, Jett testified he drove

---

[4] Jett testified Woods left the front door unlocked to facilitate the robbery. He also testified Woods told the attackers the victim kept money in the garage. Jett told the jury that the robbery was "masterminded" by the victim's son.

another block to the Wendy's restaurant, and pulled into the parking lot. He testified he immediately jumped out of the car and ran to his sister's apartment.

Kimberly Lander, a forensic scientist with the Bexar County crime lab, testified about the results of her DNA analysis on various items of evidence. Both Daniels's and Jett's DNA profile were found in the blood on the handle of the knife. Daniels's DNA profile was also discovered in the blood found on the blade of the knife, but the analysis was inconclusive as to Jett. Lander testified Jett's DNA profile was found in blood on the front door, the front porch stairs, a paper towel next to the kitchen sink, the exterior door knob on the rear door of the house, the victim's wallet and driver's license, and inside the back of the garage. She testified that Daniels was excluded as a donor of the blood found outside the house. Lander told the jury that the probability of someone else having the same DNA profile as Jett was one in 326 trillion.

### FACTUAL SUFFICIENCY

Jett contends the evidence is factually insufficient to support the jury's verdict. When considering a factual sufficiency challenge, we look at the evidence in a neutral light giving almost complete deference to the jury's determinations of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We reverse only if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust or if the evidence supporting the verdict is outweighed by the great weight and preponderance of the available evidence. *Id.* "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). A case based on circumstantial evidence is reviewed on appeal for factual sufficiency

using the same standard as that used in a direct evidence case. *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).

Jett argues the evidence is factually insufficient because the evidence demonstrated several people had access to Daniels's house between the time Daniels was last seen alive and the discovery of the body. He also argues Roxanne Guerra's testimony that she saw three or four men getting out of Daniels's car contradicts the State's theory of what occurred.[5] He concludes the evidence is too weak to link him to the murder. We disagree.

Jett's own testimony placed him at Daniels's house at the time of the murder. Jett's blood was found on the handle of the murder weapon and in various places in and around the residence, including on the victim's wallet and driver's license, and Jett admittedly drove Daniels's car to the Wendy's parking lot. Although Jett's explanation of the events accounts for much of the evidence linking him to the murder, the jury was the sole judge of Jett's credibility and had the discretion to disbelieve his testimony. Jett's credibility was called into question with evidence he had prior felony convictions for aggravated robbery and felony theft; evidence Jett told his sister an entirely different version of what occurred; evidence Jett told detectives a less embellished version of the story that differed in significant details from his testimony at trial; and Alona Woods's testimony that after the murder Jett told her he had done "a bad thing" and asked her to lie to authorities about his whereabouts on the night of the murder. The evidence supporting the verdict is not so weak as to render the verdict manifestly unfair or unjust, nor is it against the great weight and preponderance of the evidence.

---

[5] We note that Guerra's testimony also contradicts Jett's story that he jumped out of the car and ran to his sister's apartment as soon as he pulled into the parking lot.

### DEFENDANT'S ABSENCE DURING VOIR DIRE

Jett asserts the trial court violated article 33.03 of the Texas Code of Criminal Procedure by conducting voir dire while Jett was absent from the courtroom. Article 33.03 provides in part:

> In all prosecutions for felonies, the defendant must be personally present at the trial . . .; provided, however, that in all cases, when the defendant voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when the trial is before a jury, the trial may proceed to its conclusion.

TEX. CODE CRIM. PROC. ANN. art. 33.03 (Vernon 2006). The State concedes error, but argues the error was harmless.

### *Background*

On Monday, September 15, 2008, the day voir dire was scheduled to begin, Jett was brought from the Bexar County Jail and placed in a holding cell in the courts building. While waiting to appear in court, he took off the civilian clothing he had been provided for trial and put them in the toilet. When the bailiffs attempted to enter the cell, Jet swung the wet clothes at them. Jett told the bailiffs he would assault his attorneys if taken to court. The bailiffs used a taser to obtain compliance with their orders and eventually produced Jett in the courtroom. Jett appeared before the court wearing only his underwear and was restrained in leg irons and handcuffs. The judge admonished Jett that he would be removed from the courtroom and trial would proceed without him if he was unable to "behave properly" in front of the jury. Jett refused to answer any of the judge's questions. The court announced it would conduct a pretrial hearing later in the week and postponed voir dire until the following Monday, September 22.

Jett appeared in the trial court twice more that week. Initially, Jett apologized to the court for his earlier behavior. After the court ruled on some pretrial motions, Jett requested to represent himself at trial. The court extensively admonished Jett about the dangers of self-representation and

ordered an evaluation of whether Jett's mental health issues would impair his ability to adequately represent himself. The court stated it would decide the issue the following Monday, before voir dire. The judge asked Jett if he could "come to court on Monday and act appropriately." Jett responded that he could not answer the question. Because Jett had previously told the court he had hepatitis C and was HIV positive[6], and bailiffs had advised the court that Jett had a history of spitting, the judge stated Jett should wear a mask[7] when he came to court.

On Monday, September 22, Jett was brought into the courtroom confined to a wheelchair because he refused to get dressed. Jett was handcuffed, shackled, and wore a mask. He had writing on his arms. One of the bailiffs told the judge he had to "forcibly dress" Jett and then Jett urinated in his clothes. The trial court noted that during the approximately forty-five minutes Jett was before him, Jett kept his head hanging down, made no eye contact with anyone, and was nonresponsive to questions. After a recess, one of the bailiffs testified that once Jett had been taken back to the holding cell, away from the judge and his lawyers, he lifted his head, opened his eyes, and interacted with the bailiffs. The trial court denied Jett's request to represent himself, and announced jury selection would begin the next day.

The following morning, the bailiff reported to the trial court that while in the holding cell, Jett removed his clothes, put the clothes in the toilet, and covered himself with a white powder. When Jett was brought into the court, he told the court he did not want to be present for jury selection. He then announced there was a "contract" on the lives of his two lawyers, and they would be executed immediately unless they withdrew or were removed from the case. The court asked Jett

---

[6] These assertions were later verified by Dr. John Tennison, who reviewed Jett's medical records while evaluating Jett's competence to represent himself.

[7] At points in the record the mask is described as a "spit mask." No further description appears in the record.

if he would act in an orderly manner and behave during the proceedings. Jett responded he would not. The court warned Jett that he could be forced to appear at trial in jail clothes if he continued to soil his civilian clothes. Jett responded, "You got to do what you got to do, and I'm going to do what I got to do." Jett told the judge he did not intend to sit in the courtroom during jury selection and assist his lawyers in picking a jury, and said he could not "stand these bitch lawyers." Then one of Jett's lawyers attempted to place a plea offer on the record, and asked Jett if he understood the offer. Jett responded "f*ck you, man" and "F*ck both of you bitches, man." Jett was removed from the courtroom and jury selection began.

> During the initial stages of voir dire, the judge instructed the panel about Jett's absence:

> This is kind of an unusual situation. I won't comment on it too much other than to tell you at this point the defendant has voluntarily absented himself from the proceedings. That is, he does not want to be in the courtroom while the jury is being picked. He does not want to be in the courtroom while the case is being tried. And other than having to bring him in for some procedural matters or identification maters during the course of the trial, you may not ever see him in the courtroom. Beyond that, I really don't want to comment on that. But he's not present in the courtroom today . . . .

After the State conducted its general voir dire, the court had Jett brought back into the courtroom. The judge asked Jett if it was still his desire not to be involved in voir dire. Jett responded affirmatively and told the judge he would not behave appropriately if he were forced to remain in the courtroom. Jett again left the courtroom.

The defense attorneys asked the panel what they thought about Jett's absence. Several panel members suggested it was due to his guilt and that Jett did not want to "face the music." Eleven panel members indicated they agreed with this sentiment. However, when questioned individually, four of them stated they could set aside any concern about Jett's absence or would not hold it against Jett. These four eventually served on the jury.

After voir dire was completed, but before any challenges for cause were made to the court, the trial judge once again had Jett brought into court. The judge asked Jett if he wanted to participate in selecting the jury. Jett kept his head hung down and did not respond to the judge's question. Jett was removed from the courtroom and the parties completed jury selection.

*Invited Error Doctrine*

The State contends Jett induced the trial judge to remove him from the court during voir dire by engaging in a pattern of disruptive behavior. Although the State does not expressly invoke the invited error doctrine, we believe it properly applies to the facts before us. "The doctrine of invited error is properly thought of, not as a species of waiver, but as estoppel." *Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000). "[T]he law of invited error estops a party from making an appellate error of an action it induced." *Id.* Here, the trial court was faced with the choice of forcing Jett to attend voir dire or removing him from the courtroom. Because Jett had indicated he would disrupt the proceedings in a manner similar to his past conduct, the court reasonably concluded the only way voir dire could proceed without significant disruption was to remove him. Under the particular facts of this case, we hold Jett invited any error and he is estopped to claim his absence from the courtroom during voir dire violated article 33.03. *See Smith v. State*, 51 S.W.3d 806, 810 (Tex. App.—Texarkana 2001, no pet.) (declining to hold article 33.03 is violated when defendant refuses to remain in courtroom for voir dire and indicates he will disrupt proceedings if forced to do so, and holding error, if any, was harmless).

*Article 33.03 Harm Analysis*

We further conclude any violation of article 33.03 in this case was harmless. Jett argues only statutory, nonconstitutional error. Accordingly, we disregard any error that did not affect Jett's

substantial rights.  *See* TEX. R. APP. P. 44.2(b).  A defendant's substantial rights are affected when the error had a substantial and injurious effect or influence on the jury's verdict.  *Id.*  If the error had no or only a slight influence on the verdict, the error is harmless.  *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  In making this determination, we consider the entire record, including testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire if applicable.  *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003).

Jett argues his substantial rights were affected because he had previously met two of the petit jurors.  In a letter placed into the record after testimony began, Jett stated he had met one of the jurors at a record store and on another occasion bought the juror beers at a bar.  Jett stated he met the second juror at a church bible study, where he learned the juror had been a victim of crime and had a friend who was murdered.  Nothing in the record identifies the jurors to whom Jett was referring and no juror ever reported having prior contact with Jett.  Jett did not provide any further facts or any argument that his alleged previous interactions with the jurors caused them to be unfair or impartial.

A review of the remaining record reveals that any error in proceeding with voir dire in Jett's absence had no more than slight effect on the jury's verdict.  Defense counsel discussed possible reasons for Jett's absence with the panel during voir dire.  Although some of the jurors initially indicated they might hold Jett's absence against him, each of them later stated Jett's absence would not be a factor in their verdict.  The record reflects Jett was not in the courtroom during much of his trial, thus Jett's absence during voir dire was not extraordinary.  The harm occasioned by a violation of article 33.03 would ordinarily be depriving the defendant the opportunity for meaningful

involvement in jury selection. However, in this case, Jett was given the opportunity to participate and expressly told the trial court he would not assist his lawyers in picking a jury, even if he were forced to be present. Finally, the State did not refer to Jett's absence during the presentation of the evidence or closing arguments. In light of the record as a whole, any error did not have more than slight effect upon the jury's verdict.

### FORCING DEFENDANT'S PRESENCE AT TRIAL

Jett next complains the trial court erred by forcing him to appear before the jury confined in a wheelchair and in "an agitated and distressed state" so he could be identified by witnesses. Jett casts his argument as if his appearance were a piece of evidence, and argues his physical appearance[8] and conduct before the jury caused him unfair prejudice that substantially outweighed the probative value of the evidence. *See* TEX. R. EVID. 403 (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice). The State contends it needed the witnesses to make in-person identifications of Jett because his appearance had changed since his arrest. It further argues the trial court was justified in having Jett restrained because of Jett's persistent disruptive behavior. Jett counters that the four witnesses who identified him — the two detectives who took Jett's statements, Woods (Jett's girlfriend of five years), and Jett's sister Rosa Linda Medina — were all familiar with him and could have credibly identified him from a photograph.[9]

---

[8] The record does not contain any pictures of Jett or a physical description of Jett's appearance. From comments made by the trial participants, we discern Jett was confined to a chair that had wheels and straps binding at least his chest and arms to the chair, wore jail clothing, was handcuffed and shackled, and wore a mask that covered his mouth, and at times, his nose.

[9] Jett does not argue his appearance before the jury shackled, in jail clothing, and confined to a wheelchair violated any of his constitutional rights.

We review a trial court's admission of evidence over a rule 403 objection for abuse of discretion. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008). In order to preserve any error, "an objection must be made each time inadmissible evidence is offered unless the complaining party obtains a running objection or obtains a ruling on his complaint in a hearing outside the presence of the jury." *Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008).

On the first day of testimony, Jett was brought into the courtroom so Detective Willingham could identify him. Before Jett was brought in, his attorney objected to the identification because the probative value of conducting the in-person identification was outweighed by the prejudicial effect Jett's appearance in his current state would have on the jury. Jett's attorney stated "this witness" could identify Jett by other means, such as the mug shot taken the day Jett was arrested. The trial court overruled the objection. Although Jett initially preserved error by objecting and obtaining a ruling before Detective Willingham's identification, Jett subsequently waived any error by failing to object when he was brought into court to be identified by witnesses on three separate occasions the next day. Moreover, Jett voluntarily appeared in court for all of the proceedings on the third and fifth days of testimony. On each of those days, Jett was again in handcuffs, restrained in a wheelchair, wearing jail clothes, and wearing a mask. Jett's attorneys[10] did not make a rule 403 objection to Jett's appearance before the jury on any of these occasions. We hold Jett did not

---

[10] In a colloquy between Jett and the trial judge, Jett asserted that testifying from the chair violated his due process. However, his attorneys did not object on this ground.

preserve his error on this point because he failed to object to the "evidence" each time it was presented to the jury.

## IMPROPER ADMISSION OF AUTOPSY PHOTOGRAPHS

Jett next complains the trial court abused its discretion in admitting thirty-five autopsy photographs. Jett argues the autopsy photographs were cumulative because the jury had already seen pictures and a video of the crime scene, which included close-ups of several wounds. Jett contends the photographs depict the same wounds as the video, but taken from different angles and distances. He argues the only purpose of the photographs was to inflame the jury and persuade it to convict on an improper basis, and their admission violated rule 403 of the Texas Rules of Evidence. In determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, the court may consider a variety of factors, including: "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case." *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009), *petition for cert. filed*, — U.S.L.W. — (U.S. Feb. 18, 2010) (No. 09-9635). "Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself." *Id.* A photograph is also "generally admissible if verbal testimony about the matters depicted in the photograph is also admissible." *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004).

Here, thirty-two photographs show the eleven stab wounds and fifty-two other cut wounds inflicted on Daniels. Three pictures show Daniels's dentures, which appear to have been knocked from his mouth during the attack. The dentures show damage resulting from the force of the attack.

None of the photographs show any mutilation caused by the autopsy. Jett argued exhibit 150 was especially gruesome.[11] The State countered that exhibit 150 was the best picture showing a wound that went through the lower lip and the "gigantic" laceration above the victim's eyebrow. No other photograph showed that laceration. The medical examiner testified she had taken many more autopsy photographs and that she had selected the pictures that best showed the injuries. The medical examiner testified she took all the autopsy photographs except exhibit 150, which she described as an "identification" photograph taken by staff in her office. Many of the photographs show close-ups of injuries and were used by the medical examiner during her testimony to describe the wounds inflicted upon the victim.

The trial court did not abuse its discretion in admitting the photographs. The medical examiner's testimony about the wounds was relevant and the pictures were merely a visual representation of that testimony. The wounds were also described in the autopsy report, which was admitted into evidence without objection. Jett's argument is that the results of the crime were horrific, but the result of the crime is the very issue that is relevant and probative:

> Appellant must realize that it is precisely the quality which we describe as "powerful" which gives rise to his arguments that the photographs are prejudicially inflammatory. But when the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence. A trial court does not err merely because it admits into evidence photographs which are gruesome.

*Id.* at 540 (quoting *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995). Jett's issue concerning the photographs is overruled.

---

[11] Exhibit 150 shows Daniels's face and an identification number laying across his chest. Numerous injuries appear on his face and his tongue appears to be swollen and protruding from his mouth.

**CONCLUSION**

The judgment of the trial court is affirmed.

Steven C. Hilbig, Justice

PUBLISH